UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH DECHTER, on behalf of herself and all others similarly situated,<br><br>                  Plaintiff,<br><br>     v.<br><br>CENTERLINE HOLDING COMPANY, MARC D. SCHNITZER, ROBERT L. LEVY, STEPHEN M. ROSS and JEFF T. BLAU,<br><br>                  Defendants. | Case Action No.: 08 CV 1593<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br> |

Plaintiff, Deborah Dechter ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission (the "SEC") filings, wire and press releases published by and regarding Centerline Holding Company ("Centerline" or the "Company"), securities analysts' reports and advisories about the Company, information readily obtainable on the Internet..

## NATURE OF THE ACTION

1.     This is a federal securities class action brought by Plaintiff on behalf of all purchasers of Centerline common stock on the open market between March 12, 2007 and December 28, 2007, inclusive (the "Class Period"). The complaint seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Defendants are Centerline

1

and four of the Company's most senior officers and trustees: Chief Executive Officer Marc D.

Schnitzer ("Schnitzer"), Chief Financial Officer Robert L. Levy ("Levy"), Chairman Stephen M.

Ross ("Ross"), and Managing Trustee Jeff. T. Blau ("Blau") (collectively, the "Individual

Defendants" and together with Centerline, "Defendants").

2.    Centerline, formerly CharterMac, is a statutory trust that conducts substantially all

of its business through its subsidiaries. During the Class Period, the Company operated as a full

service investing and finance company with its core focus on real estate. The Company provides

capital solutions to developers and owners of properties, as well as investment products to

institutional and retail investors.

3.    Throughout the Class Period, Centerline was comprised of the following business

segments: (1) Affordable Housing; (2) Asset Management; (3) Credit Risk Products; and (4)

Commercial Real Estate. The Affordable Housing segment is responsible for the management of

the Company's revenue bond portfolio, which is comprised primarily of tax-exempt first

mortgage bonds.

4.    The Class Period begins on March 12, 2007, when Centerline issued a press

release announcing its financial results for the fourth quarter and full year ended December 31,

2006, in which Defendants touted the growth in the Company's portfolio of tax-exempt first

mortgage bonds, which, at the time, had a fair value of $2.397 billion, as compared to $2.294

billion at the end of 2005.

5.    Beginning as early as March 12, 2007 and continuing through the Class Period,

certain of the defendants, including Defendants Ross, Blau and Schnitzer, devised and

implemented a plan to alter the Company's financial structure (and shareholder base) from that of

an income-oriented company to a growth-oriented company. Because this change of the Company structure would draw an immediate and negative response from the Company's investors, Defendants concealed their plan from the Company's shareholders through a series of false and misleading public statements in press releases and on conference calls.

6.      On December 28, 2007, the Company finally revealed their secret plan and shareholders learned the shocking truth, when Centerline announced that it had sold its $2.8 billion tax-exempt affordable housing bond portfolio to Federal Home Loan Mortgage Corporation ("Freddie Mac"), thereby changing its business model to an asset management company that would be unsuitable for investors seeking income for dividends. Defendants stated that the "transformation represented a major step in Centerline's plan to transform itself into an alternative asset management company." The December 28, 2007 press release revealed that Centerline was required to take a $95 million charge on the sale to Freddie Mac to reflect the current value of the portfolio. In addition, Centerline was required to assume a $140 million contingent obligation on the sale of the debt portfolio to Freddie Mac. Defendants had secretly financially re-engineered Centerline from an income-oriented company to a growth-oriented company, worsening the Company's risk profile. At the same time, Defendants caused the Company's dividend to be suddenly slashed by 64%, from $1.68 per share to $.60 per share.

7.      Even more disturbing was the fact that Centerline's Non-Executive Chairman Defendant Ross and its Managing Trustee Defendant Blau, who already controlled 10,295,085 shares or 13% of the Company, made a sweetheart investment in Centerline. Through an affiliated company called, the Related Companies, L.P ("TRCLP"), Defendants Ross and Blau invested $131 million in return for newly-issued preferred stock, which pays an annual dividend

and is convertible to 12.2 million shares of common shares of Centerline. Defendants announced that Centerline will use the net proceeds of this transaction to reduce corporate debt and fund the Company's growth plans.

8.     Upon release of this news, the Company's shares fell $2.57 per share or over 25%, to close on December 28, 2007 at $7.70 per share, on unusually heavy trading volume of 4.1 million shares, from the previous day's close of $10.27.

9.     The March 12, 2007 press release– and Defendants's subsequent Class Period statements-- failed to disclose material adverse facts about the Company's financial well-being, business relationships and prospects, specifically that the value of the Company's portfolio was less valuable than investors were led to believe. Specifically, Defendants failed to disclose that they were in the midst of structuring a sale of the Company's entire tax-exempt mortgage revenue bond portfolio (which was responsible for the majority of the Company's income) to Freddie Mac. Nor did Defendants disclose to the investing public that such a transaction would transform the Company's business model and investor profile. On the contrary, Defendants' Class Period statements created the false impression that the Company would retain its tax-exempt mortgage revenue bond portfolio and that investors would continue to benefit from the substantial dividends generated by the portfolio's income for the indefinite future.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other members of the Class suffered significant damages.

### JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Centerline maintains it principal executive offices within this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### THE PARTIES

15.     As set forth in the attached Certification, Plaintiff Deborah Dechter purchased Centerline common stock during the Class Period at artificially inflated prices and was damaged thereby.

16.     Defendant Centerline (formerly CharterMac) is a Delaware corporation with its principal executive offices located at 625 Madison Avenue, New York, New York. Centerline is an investing and finance company with a core focus on real estate.  Centerline's common stock is listed on the New York Stock Exchange ("NYSE") and trades under the symbol "CHC".

17.     Defendant Schnitzer was, at all relevant times, the Company's President, Chief

Executive Officer ("CEO"), and a managing trustee. According to the Company's Definitive Proxy Statement filed with the SEC on April 23, 2007, Defendant Schnitzer "directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning."

18.    Defendant Levy was, at all relevant times, the Company's Chief Financial Officer ("CFO").

19.    Defendant Ross was, at all relevant times, the Company's Chairman of the Board of Trustees (the "Board"). Defendant Ross is also Chairman, Chief Executive Officer, founder and Managing General Partner of TRCLP. According to the April 23, 2007 Proxy, Defendant Ross owns 93% of TRCLP.

20.    Defendant Blau was, at all relevant times, a managing trustee of the Company. Defendant Blau is also President and Managing Trustee of TRCLP. According to the April 23, 2007 Proxy, Defendant Blau owns 8% of TRCLP.

21.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Centerline's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as

those statements were each "group published" information, the result of the collective actions of the Individual Defendants and should also be deemed "control persons" of the Company.

## SUBSTANTIVE ALLEGATIONS

### Background Regarding Centerline and TRCLP

22. Centerline, formerly CharterMac, is a statutory trust that conducts substantially all of its business through its subsidiaries. During the Class Period, the Company operated as a full service investing and finance company with its core focus on real estate. The Company provided capital solutions to developers and owners of properties, as well as investment products to institutional and retail investors. During the Class Period, Centerline was comprised of the following business segments: (1) Affordable Housing, (2) Asset Management; (3) Credit Risk Products; and (4) Commercial Real Estate. The Affordable Housing segment is responsible for the management of the Company's revenue bond portfolio, which is comprised primarily of tax-exempt first mortgage bonds.

23. According to the Company's April 23, 2007 Proxy, TRCLP owns 12.8% of Centerline. TRCLP, through its ownership of Related General II, L.P. owns 685 Common Shares and 10,194,400 Special Common Units of Centerline Capital Company, LLC (formerly known as CharterMac Capital Company LLC), which are convertible into Common Shares of the Company on a one-for-one basis, subject to certain restrictions, and the associated 10,194,400 Special Preferred Voting Shares. Related General II, L.P. is owned by TRCLP. Defendant Ross owns 92% of TRCLP and Defendant Blau owns the remaining 8%.

24. TRCLP profits from its close relationship with Centerline though various services contracts and management agreements. For instance, the Related Management Company, which is

wholly owned by TRCLP, earned fees for performing property management services for various

properties held in investment funds managed and consolidated by Centerline. The fees totaled $4.3

million in 2006. Additionally, TRCLP provides services to Centerline under a shared services

agreement. The services provided include office management, payroll, human resources and other

office services. The majority of the services are charged to Centerline at the direct cost incurred by

TRCLP. During 2006, Centerline paid TRCLP $620,000 for such services.

### Defendants' False and Misleading Statements Issued During the Class Period

25.    The Class Period begins on March 12, 2007, when the Company issued a press release

at approximately 2:29pm during the course of trading, announcing its financial results for the fourth

quarter and year-ended December 31, 2006. The March 12, 2007 press release reported revenues

of $127.9 million for the fourth quarter of 2006, as compared to $79.8 million for the fourth quarter

of 2005 (representing a 60.3% year-over-year), and revenue of 387.25 million for the full year of

2006, as compared to $295 million for 2005 (representing a 31.2% increase year over year). The

March 12, 2007 press release also highlighted the Company's ongoing evolution from a tax-exempt

bond fund to a full service real estate finance and investment company, stating:

> *"We completed several major initiatives in 2006 that significantly changed our Company and transformed CharterMac from a firm focused mainly on affordable and multifamily housing to a full-service real estate finance and investment company,"* said Marc D. Schnitzer, Chief Executive Officer and President of CharterMac. "Our accomplishments included the acquisition of ARCap, one of the nation's leading high-yield CMBS fund managers, the launch of Centerbrook Financial, our credit risk products company, the rollout of a new credit approval process, the divestiture of two non-core investments and the completion of a corporate re-engineering. We believe that all of these initiatives will help create a more efficient operating structure and provide us with a best-in-class platform to grow and compete in a very competitive industry. *Today we can provide a broad array of debt and equity products for any type of real estate property."*

26.    Additionally, the Company reported in its March 12, 2007 press release, "Cash Available for Distribution ("CAD"), CharterMac's primary performance measure," of $28.4 million and $111 million for the fourth quarter and full year 2006, respectively, as compared to $27.2 million and $114.7 million for the fourth quarter and full year 2005, respectively. The Company explained its pro forma CAD metric as follows:

> [Centerline] believes that Cash Available for Distribution ("CAD") is helpful to investors in measuring the performance of our Company. CAD is the performance measure used by our chief decision-makers to allocate resources among our segments. CAD represents net income (computed in accordance with GAAP), adjusted for:
>
> -- Cash fees and other revenues received but deferred in accordance with GAAP. Fees recognized for CAD but deferred for GAAP purposes are generally earned over a period of time in connection with certain of our product lines, such as fund sponsorship and credit intermediated fees.
>
> -- The effect of straight line revenue recognition of interest income on revenue bonds with fixed changes in interest rates.
>
> -- Depreciation and amortization, including write-off of intangible assets.
>
> -- Non-cash gains recognized on sale of mortgage loans when servicing rights are retained.
>
> -- Losses on sales of loans or repayment of revenue bonds.
>
> -- Impairment losses.
>
> -- The portion of tax benefit or provision that is not expected to be realized in cash.
>
> -- Non-cash compensation expenses.
>
> -- The difference between earnings allocated to Subsidiary Equity in accordance with GAAP and distributions to holders of that equity.
>
> There is no generally accepted methodology for computing CAD, and the Company's

computation of CAD may not be comparable to CAD reported by other companies. CAD does not represent net cash provided by operating activities determined in accordance with GAAP and should not be considered as an alternative to net income (determined in accordance with GAAP) as an indication of the Company's performance, as an alternative to net cash provided from operating activities (determined in accordance with GAAP) as a measure of our liquidity, or as an indication of our ability to make cash distributions.

27.    On March 12, 2007, Centerline also filed with the SEC its 2006 annual report on

Form 10-K. The 2006 Form 10-K was signed and certified by Defendants Schnitzer and Levy.

Additionally, the 2006 Form 10-K described the Company's business model as a full-service

real estate finance and investing company that maintained a portfolio of "tax exempt first

mortgage revenue bonds," *inter alia*, as follows:

Through our subsidiaries and funds which they manage, we are a full-service real estate finance and investing company. Our subsidiaries have direct financing relationships with approximately 875 real estate developers and owners throughout the country and we have strong relationships with various institutional investors, pension funds and endowments. We provide an array of products and operate from a fully integrated platform, which enables us to originate, underwrite and manage the risk of most transactions in which we provide debt or equity. Our platform offers us several competitive advantages, including:

o THE ABILITY TO CROSS-SELL FINANCING PRODUCTS. Frequently on transactions, we offer more than one component of a property's capital;

o THE ABILITY TO ORIGINATE THE TRANSACTION WHOLESALE, which enables us to capture substantially all of the financing fees associated with each transaction;

o THE ABILITY TO CONTROL THE CREDIT QUALITY OF THE UNDERLYING PROPERTY. By working directly with the property's owner and by managing the risks of the underlying asset, our credit losses have historically been low; and

o THE ABILITY TO PROVIDE PRODUCTS AND SERVICES THROUGHOUT THE PROPERTY'S FINANCING LIFE CYCLE.

Operating Segments

We operate in four business segments:

**1. *PORTFOLIO INVESTING, which includes subsidiaries that invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities and other investments.* The proceeds of mortgage revenue bonds are used by the borrowers to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing throughout the United States.**

This segment may also include loans to and other investments in other business or funds involved in real estate or real estate finance. Such investments have included our pre-acquisition investment in ARCap Investors, LLC ("ARCap"). (Emphasis Added).

\*    \*    \*

28.    With respect to the Company's mortgage revenue bond portfolio, the 2006 Form

10-K, *inter alia*, stated:

**1. PORTFOLIO INVESTING**

We conduct most of our portfolio investing through our CharterMac Equity Issuer Trust I and CharterMac Equity Issuer Trust II subsidiaries. Throughout this document, we will refer to both of these subsidiaries collectively as "Equity Issuer".

*As of December 31, 2006, our revenue bond portfolio includes direct and indirect interests in mortgage revenue bonds with an aggregate fair value of approximately $2.8 billion (prior to $397.3 million of eliminations related to bonds issued by partnerships we consolidate), secured by affordable multifamily properties containing 56,048 units located in 30 states and the District of Columbia.* While most of these mortgage revenue bonds generate tax-exempt income, certain of them generate taxable income. The taxable mortgage revenue bonds are held at the parent trust.

*Our Portfolio Investing business generates most of its income and cash flow from a positive spread between the interest earned from our mortgage revenue bond portfolio and the cost of capital we use to purchase the bonds.* We occasionally receive participating interest on certain mortgage revenue bonds which is equal to a percentage of net property cash flow of the net sale or refinancing proceeds. We also receive fees from borrowers for the acquisition of new mortgage revenue bonds.

The acquisition of mortgage revenue bonds requires capital. In addition to using a portion of our operating cash flows, we obtain such capital by securitizing most of the bonds we purchase and by issuing equity securities. (Emphasis added.)

29.    Furthermore, the 2006 Form 10-K reported that Centerline had increased the size

of its mortgage revenue bond portfolio during 2005 and 2006 and gave no indication that the

Company was planning to restructure its business strategy. Specifically, the 2006 Form 10-K,

*inter alia*, stated:

The increase in mortgage revenue bond interest income is primarily due to ***expanding our revenue bond portfolio in 2005 and 2006***, although the rate of investment has slowed due to challenging market conditions we have experienced since 2004.

30.    With respect to dividends, the 2006 Form 10-K reported that the Company has

paid investors a dividend of $1.68 per share in 2005, as compared to a dividend of $1.65 per

share in 2005.

31.    With respect to the Company's disclosure controls, the 2006 Form 10-K, *inter*

*alia,* stated:

Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this annual report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this annual report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

32.    Centerline also held an analyst conference call on March 13, 2007, during which

Defendants reaffirmed the financial results reported in the March 12, 2007 press release and the

2006 Form 10-K. Additionally, Defendant Schnitzer commented on the upcoming change in the

Company's name and the corporate "reengineering" completed in 2005-2006, *inter alia*, stating:

> **The final initiative that I would like to discuss is our corporate reengineering.**
> Following our management change in November of 2005, we began a complete
> reengineering of our organization, the goal of which was to create a more efficient
> operating platform while maintaining our high level of service. We examined
> several areas of our Company and found redundancies and inefficient procedures.
> Following the ARCap acquisition, we took another look at our structure in the
> context of our growth plans and the desire to broaden our asset classes. As a result
> of these efforts, we have created a new credit approval process and strengthened
> our asset management platform. We also recognized that we were a difficult
> company to understand and explain to our many stakeholders. Beginning in 2001,
> we made a series of acquisitions and as a result we operate through several
> subsidiaries, each of which has its own brand name. In connection with our
> reengineering, we launched a branding initiative that is nearly complete. We
> believe that it is critical to operate as one Company, with one brand name and all
> 530 employees aligned with and focused on the success of that single company.
>
> Therefore, within the next 30 days, we will announce that we will change the
> name of our Company and eliminate our subsidiary structure and all existing other
> brand names. When our new brand is rolled out, we will introduce our new
> structure, which will consist of four business groups: Affordable Housing,
> Commercial Real Estate, Asset Management and Credit Risk Products. We have
> identified the leaders of each group and will announce their appointments at the
> time we announce our new name. The four business groups will be supported by
> our risk policy, legal, human resources, finance, corporate communications and
> information technology departments, which together will form our corporate
> group. We believe that this structure will enable to us reap even greater benefits
> from the integration of our past and future acquisitions and describe our business
> in a clearer fashion. Our first quarter 2007 financial reports will be modified to
> reflect our new structure and we will introduce new performance metrics for each
> of our business groups.

33.     As to Centerline's Affordable Housing group– the segment responsible for

managing the Company's mortgage revenue bond portfolio– Defendant Schnitzer indicated that

the Company's restructuring had not reduced its commitment to this business and expected it to

continue growing, stating:

> *With respect to our Affordable Housing group, which includes our low-income housing tax credit and tax-exempt bond businesses, we expect to have another strong year. We expect stability and modest growth from this business due to the statutory limitations on the availability of both tax credits and tax-exempt bonds.* Since the inception of the tax credit program in 1986, we have been an industry leader with significant market share. Our firm's significant growth and diversification has not reduced our commitment to the affordable housing business. We will continue to represent the highest standard for this industry and seek innovative new products for financing affordable housing.
>
> At the end of 2006, investor demand in the tax-credit equity market was significantly reduced due to historic low rates of return. Since late 2006, yields have increased by more than 100 basis points and investors have shown renewed interest in early 2007. The increased yields have not yet allowed for an increase in margins. However, we believe that margins will be stable in 2007 after declining in 2006. *Our growth plans in affordable housing include the development of new complimerary -- complimentary products, incremental tax credit equity market share gains, and in expense reductions.* The additional tax credits authorized by Congress after Hurricane Katrina in the Gulf opportunity zone -- which is comprised of Louisiana, Mississippi and Alabama -- have provided us with several opportunities to finance large transactions in that area of the country.
>
> *With respect to tax-exempt bonds, the current supply in the market is low and the demand is at an all-time high.* Many national and regional banks have entered the private placement business in order to diversify their product offerings and meet CRA needs. In addition, Fannie Mae and Freddie Mac have become more competitive and now offer longer amortization and more aggressive terms. Overall, we expect flat tax-exempt bond originations for 2007 compared to 2006. (Emphasis added.)

34.    On May 10, 2007, Centerline issued a press release, before the market opened,

announcing its financial results for the first quarter of 2007.  The May 10, 2007 press release

reported that the Company's mortgage revenue bond portfolio was then valued at $2.46 billion.

In addition, the May 10, 2007 press release, *inter alia*, stated:

> Due to the seasonality of our business, our origination volume across our business lines tends to be the slowest in the first quarter and as a result, our earnings and Cash Available for Distribution are not earned evenly throughout the year," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In

addition, our first quarter financial results were impacted by an impairment we recorded in connection with revenue bonds secured by mortgages on six properties and a charge to reserve against associated receivables. Therefore, *while our dividend payout ratio is above 100% in this quarter, we are comfortable that our annual dividend will continue to have adequate coverage.* We have solid investment pipelines in both our Commercial Real Estate Group and Affordable Housing Group and we continue to see a tremendous amount of transaction volume. In addition, *we are working on several new growth initiatives we expect to launch in 2007. Based on the progress we have made executing our business plan to date, we remain confident that we will meet our investment and financial goals for the year and do not believe it is necessary to revise our guidance at this time."*

35.    Also on May 10, 2007, Centerline filed with the SEC its quarterly report on Form

10-Q for the first quarter of 2007 (the "First Quarter 10-Q"), which was signed by Defendants

Schnitzer and Levy, and reaffirmed the Company's financial statements reported in the

Company's May 10, 2007 press release. Defendants Schnitzer and Levy certified pursuant to

Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that "[t]he information contained in the

Report fairly presents, in all material respects, the financial condition and results of operations of

Centerline." The Company stressed that the fair value of its mortgage revenue bonds was $2.46

billion as compared to $2.39 billion at the end of 2006. Morever, revenue from interest income

amounted to 63% of the Company's total revenue, compared to 57.6% in the first quarter of

2006.

36.    With respect to the Company's disclosure controls, the First Quarter 10-Q, *inter

alia,* stated:

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report

were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

37.    Centerline also held an analyst conference call on May 10, 2007 during which Defendants reaffirmed the financial results reported in the May 10, 2007 press release, as well as the First Quarter 10-Q. In addition, Defendant Schnitzer stated:

As we stated in this morning's press release, due to the seasonality of our business our origination volume across business lines tends to be the slowest in the first quarter. As a result, our earnings and cash available for distribution are not earned evenly throughout the year. In addition, our first quarter financial results were impacted by an impairment we recorded in connection with six revenue bonds we hold on our balance sheet and a charge to reserve against associated receivables. Although our dividend payout ratio is above 100% in this quarter we are comfortable that our annual dividend will continue to have adequate coverage. We have solid investment pipelines in both our Commercial Real Estate Group and our Affordable Housing Group, and we continue to see a tremendous amount of transaction volume.

38.    On August 9, 2007, Centerline issued a press release, before the market opened, announcing its financial results for the second quarter and six months ended June 30, 2007. The August 9, 2007 press release stated:

*Stable credit performance within $2.8 billion revenue bond portfolio; At June 30, 2007, thirteen bonds with an outstanding balance of $70.1 million were delinquent, representing 2.5% of the entire portfolio;*

*            *            *

In the past few weeks, the financial markets have been impacted by a re-pricing of risk and withdrawal of liquidity due to the serious credit problems in the single-family subprime mortgage industry," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "Centerline does not have any single-family or subprime exposure whatsoever. We are a commercial real estate finance and investment company and provide financing only for commercial and

multifamily properties. As evidenced by our CAD growth this quarter, our core businesses continue to perform well and the credit quality of the investments we manage remains strong."

Mr. Schnitzer continued: "The recent market dislocation has created numerous opportunities to make investments that offer attractive risk-adjusted returns and strong credit quality. In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline, that have a proven ability to assess and manage real estate risk. *We will monitor market conditions carefully as we continue to execute our core strategy.* (Emphasis added.)

39.     Also on August 9, 2007, Centerline filed with the SEC its quarterly report on

Form 10-Q for the second quarter of 2007 (the "Second Quarter 10-Q"), which was signed by

Defendants Schnitzer and Levy, and reaffirmed the financial results reported in the Company's

August 9, 2007 press release. Defendants Schnitzer and Levy certified pursuant to Sections 302

and 906 of the Sarbanes-Oxley Act of 2002 that "[t]he information contained in the Report fairly

presents, in all material respects, the financial condition and results of operations of Centerline."

40.     With respect to the Company's disclosure controls, the Second Quarter 10-Q,

*inter alia*, stated:

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES
Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

41.     The Company also held an analyst conference call on August 9, 2007, during

which Defendants reaffirmed the financial results reported in the August 9, 2007 press release, as

well as the Second Quarter 10-Q. During this call, Defendant Schnitzer commented on the

subprime mortgage crisis and the overall financial condition of Centerline, *inter alia*, stating:

> In the past few weeks, the financial markets have been impacted by a repricing of
> risk and withdrawal of liquidity, due to the serious credit problems in the
> single-family subprime mortgage industry. ***I would like to assure you that
> Centerline does not have any single-family or subprime exposure whatsoever.
> We are a commercial real estate finance and investment company, and we
> provide financing only for commercial and multifamily properties***. As
> evidenced by our CAD growth this quarter, our core businesses continue to
> perform well, and the credit quality of the investments we manage remains strong.
>
> In spite of the instability in the financial markets, operating fundamentals in the
> commercial real estate and affordable housing sectors are healthy. We have
> sufficient capital resources to execute our business plan, and we are not
> experiencing any liquidity problems. In fact, during the past 30 days, we have
> priced a collateralized debt obligation offering from one of our CMBS funds and
> closed on the expansion of our revolving credit facility. Both transactions
> demonstrate our ability to execute in a volatile market environment.
>
> The recent market dislocation has created numerous opportunities to make
> investments that offer attractive returns and strong credit quality. ***In times of
> market instability, we would expect to see a flight to quality that benefits firms
> like Centerline***, that have a proven ability to assess and manage real estate risk.
>
> Our business is sound. Despite that, we have seen our stock price decline in recent
> weeks as concerns about mortgage or real estate-related businesses spread to the
> stock market. Many of our investors inquired as to why we did not make any
> public statements during this period. We felt that it was important to wait until we
> released our earnings, so we could support the confidence we have in our business
> with solid facts.
>
> As we reported in this morning's press release, we had a very strong quarter, with
> CAD per share of $0.46, which is a 12.2% increase over CAD per share in the
> second quarter of 2006. As of June 30th, our direct assets under management were
> $17.1 billion, an increase of 7% over the first quarter.
>
> ***The market instability has had little or no impact on our Affordable Housing
> Group, which includes our tax-exempt bond and tax credit equity fund
> businesses. Affordable Housing represents approximately 65% of our annual
> CAD revenues.***

*     *     *

In regard to our direct tax-exempt bond business, we continued to experience strong competition for originations, mostly from large banks that acquire bonds to satisfy their Community Reinvestment Act requirements. As a result, we have lowered our budget for new bond originations in 2007 to $300 million, from the $400 million we had originally projected.

***The credit quality of our bond portfolio remains very strong***. As of June 30th, delinquencies totaled just $70.1 million, or approximately 2.5% of our $2.8 billion portfolio. After the impairments we recorded in the first quarter, we performed a thorough re-underwriting of 122 bonds in our portfolio that were not performing as well as we expected out of our total of 376 bonds. In the second quarter, we recorded only an additional $3 million in permanent impairments with respect to these bonds.

Since our inception as a public company in 1997, our bond portfolio has incurred less than $30 million, or approximately 1%, in cumulative permanent impairments. (Emphases added.).

42.    During the August 9, 2007 conference call, Defendant Levy also commented on

the Company's financial condition in light of the subprime crisis, *inter alia*, stating:

We have almost no mark-to-market risk, and we are fully compliant with all covenants on all of our facilities. In the past few months, we have closed on $270 million in new debt facilities, as we expanded our corporate revolver in our agency facility, proving our access to capital in a very difficult environment. And our most significant funding source, our bond securitizations, are financed in what has proven to be a safe-haven market.

Finally, we are being very careful to maintain our liquidity in the face of the recent market turbulence. As of June 30th, 2007, Centerline had $169 million in liquidity, including $111 million in cash and $58 million in availability in our corporate revolver. I hope this description gives you some comfort as to the health of our balance sheet and our funding sources.

43.    With respect to the Company's financial results for the second quarter of 2007,

Defendant Levy highlighted the Company's 9.8% increase in revenue as compared to the second

quarter of 2006, which he attributed, in part, to an increase in the size of the Company's tax-exempt bond portfolio, stating:

> For the three months ended June 30th, 2007, Centerline reported cash available for distribution, or CAD, of $26.9 million, or $0.46 per diluted share; compared to $23.9 million, or $0.41 per diluted share, in the corresponding three-month period of 2006.
>
> \*       \*       \*
>
> Total revenues for the three months ended June 30th, 2007 were $94.6 million, versus $86.2 million in the corresponding period last year. This year-over-year 9.8% increase is primarily due to the impact of the ARCap acquisition and the increased size of our tax-exempt bond portfolio.
>
> Over the past four quarters, our bond portfolio has grown by $230 million, while the average yield on the portfolio has held steady, at 6.6%. Year-to-date, we have had almost no repayments of bonds and do not expect a significant number this year. Our bond portfolio remains very healthy from a credit perspective, as we have recognized only $2.9 million in additional impairments in the second quarter, equating to 0.1% of the total principle outstanding. (Emphasis added.)

44.     On November 8, 2007, Centerline issued a press release, before the market opened, announcing its financial results for the third quarter and nine months ended September 30, 2007. The November 8, 2007 press release reported the fair value of the Company's revenue bonds portfolio as $2.578 billion, as compared to $2.397 billion as of December 31, 2006. The November 8, 2007 press release also highlighted a 2.4% increase in quarterly revenue and stable performance of the Company's bond portfolio, *inter alia*, as follows:

> -Revenues, adjusted to exclude Consolidated Partnerships(a), of $104.8 million, an increase of 2.4% over the third quarter of 2006;
>
> -- Centerline's Affordable Housing Group ("Affordable Housing") raised $132.9 million of gross equity for various low income housing tax credit ("LIHTC") investment funds

45.     Commenting on these results, Defendant Schnitzer stated:

Despite the ongoing credit crisis, Centerline had another solid quarter of operations," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In very difficult market conditions, we closed a $585 million high-yield CMBS fund and priced and closed a $986 million CDO for one of our CMBS investment funds. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk

46.    On November 9, 2007, Centerline filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2007 (the "Third Quarter 10-Q"), which was signed by Defendants Schnitzer and Levy. Defendants Schnitzer and Levy certified pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Centerline." The Third Quarter 10-Q reaffirmed the financial results reported in the Company's November 9, 2007 press release, and reported that $70.2 million in revenue from the Affordable Housing segment, representing approximately 55.6% of the Company's total revenue for the third quarter of 2007.

47.    The Third Quarter 10-Q represented that the Company's mortgage revenue bond portfolio was continuing to produce positive yields and that revenue from this portfolio had increased during 2007, *inter alia*, as follows:

The increase in mortgage revenue bond interest income is primarily due to the higher portfolio balance due to acquisition activity in the past year offset by a lower weighted average yield when analyzed against the comparable period.

While generally declining yields of bonds acquired has gradually lowered the average yield of our portfolio, we continue to earn a positive spread on our portfolio. With an increase in the average portfolio balance, our level of securitizations also increased which resulted in higher interest expense and securitization fees. By entering into a fixed rate securitization in 2006 and using interest rate swaps to fix the rate on a large portion of our remaining securitizations, we believe that we have significantly mitigated the impact on spreads of fluctuating SIFMA rates. (Emphasis added.)

48.    With respect to Centerline's business model, and in particular, its Affordable

Housing segment (the segment responsible for managing the Company's mortgage revenue bond

portfolio), the Third Quarter 10-Q, *inter alia*, stated:

> Affordable Housing brings together the users and providers of debt and equity
> capital to the affordable multifamily rental housing industry, and includes:
>
> o Mortgage Revenue Bond Investing - through the parent and our subsidiaries, we
> invest primarily in tax-exempt first mortgage revenue bonds issued by various state
> or local governments, agencies or authorities. The proceeds of these mortgage
> revenue bonds are used to finance the new construction, substantial rehabilitation,
> acquisition, or refinancing of affordable multifamily housing properties located
> throughout the United States; and

49.    With respect to the Company's disclosure controls, the Third Quarter 10-Q, *inter

alia*, stated:

> (a) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES
> Our Chief Executive Officer and Chief Financial Officer have evaluated the
> effectiveness of our disclosure controls and procedures (as defined in Rule
> 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended
> (the "Exchange Act")) as of the end of the period covered by this quarterly report.
> Based on such evaluation, such officers have concluded that our disclosure controls
> and procedures as of the end of the period covered by this quarterly report were
> effective to ensure that information required to be disclosed by us in the reports
> that we file or submit under the Exchange Act is recorded, processed, summarized
> and reported within the time periods specified in the SEC rules and forms, and to
> ensure that such information is accumulated and communicated to our
> management, including the Chief Executive Officer and Chief Financial Officer, as
> appropriate, to allow timely decisions regarding required disclosure.

50.    The Company also held an analyst conference call on November 8, 2007, during

which Defendants reaffirmed the financial results reported in the November 8, 2007 press release

as well as the Third Quarter 10-Q. During this conference call, Nicole Jacoby, an analyst from

Liberation Investments, asked Defendant Schnitzer whether Centerline had considered selling its

tax-exempt mortgage revenue bond portfolio in order to transform the Company into a pure asset

management firm. Defendant Schnitzer admitted that the Company had considered that

possibility, but he intentionally concealed the fact that such a deal was in the works and was

expected to close before the end of 2007. Specifically, Defendant Schnitzer, *inter alia*, stated:

> NICOLE JACOBY, ANALYST, LIBERATION INVESTMENTS: I just wanted to
> ask you guys, particularly in the current market environment you've been putting us
> out some really solid performance. However, it's obvious in your stock price that
> you're not being rewarded for that in the marketplace. You addressed before a little
> bit about your -- you're thinking about stock buybacks. But more generally, can you
> walk us through your thinking about how you can help close that value gap or
> initiatives you might take to close that gap between where your stock price is and
> the true value of the Company?

> MARC SCHNITZER: Well yes, we believe and we have believed for some time
> that the way to really increase the value of the Company is to continue to evolve
> the Company into a fund manager. And, many of you will recall that back in 1997,
> when we were called CharterMac and the company first went public, it had one
> line of business and that was really to be a tax-exempt bond fund that lent money
> long and borrowed short.

> Ever since that time, our growth has really focused on evolving into externally
> managed funds whether it's our tax credit funds, our CMBS funds, our high yield
> debt funds, our joint venture equity funds, the CLO business. All of these
> significant growth initiatives and others that we're thinking about, such as this debt
> opportunity fund are steering us toward an evolution into much more of a pure
> fund manager which is where we really see the growth for the Company and we
> believe that the marketplace rewards companies like that with a higher valuation on
> their income stream to a much greater extent than our Company realizes today.

> So, we've been going through this evolution. We will continue to go through this
> evolution and our goal will be to make the Company into much more of a pure
> fund manager and then go out and tell the world about it in the most effective way
> that we can. And our thesis would be that our multiple should go up and that's what
> our advisors have suggested. So, that's more of a global approach. I don't know if
> that is as specific an answer as you wanted.

> NICOLE JACOBY: Well, I understand. I think we've had some of these
> discussions before about turning into a fund manager. There are two further issues.
> One is, you are obviously executing along that track. But the market still doesn't

seem to either recognize it or be rewarding it. And, sort of related to that, have you ever considered putting -- taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?

MARC SCHNITZER: Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time. We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

NICOLE JACOBY: And is there anything -- so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?

MARC SCHNITZER: We've thought about that and many other options. But, clearly that's one that would come to mind right away.

51.    The statement contained in ¶¶ 25-50 were materially false and misleading when made because: (i) Defendants knew but failed to disclose that the Company was negotiating to sell its tax-exempt mortgage revenue bond portfolio (which had historically generated the majority of the Company's revenue) to Freddie Mac before the end of 2007; (ii) Defendants knew that investors would reasonably expect the Company to maintain its tax-exempt revenue bond portfolio for the indefinite future rather than selling it before the end of 2007; (iii) that without the tax-exempt mortgage bond portfolio, the Company would no longer be able to pay the substantial dividends that Centerline investors had been accustomed to and expected to receive, and which had often served as the basis for the investors' decision to purchase Centerline shares; (iv) that the planed sale of the Company's tax-exempt mortgage revenue bond portfolio to Freddie Mac would completely transform Centerline's business model from a tax-exempt bond fund to a pure asset management company, thus making Centerline securities a far riskier investment than previously; (v) that the Company was engineering a related party transaction with TRCLP that would divert a

significant portion of future income to insiders, including Defendants Ross and Blau who own and

control TRCLP; (vi) that the Company lacked adequate internal and financial controls and

procedures; and (vii) that as a result of the foregoing, the Company's statements about its

financial well-being and future business prospects were lacking in any reasonable basis when

made.

## The Market Begins to Learn the
## Nature and Magnitude of the Wrongdoing

52.     On December 28, 2007, Centerline shocked investors when it issued a press release,

before the market opened, revealing that the Company had sold its $2.77 billion tax-exempt and $30

million taxable affordable housing bond portfolio to Freddie Mac pursuant to Freddie Mac's Tax

Exempt Bond Securitization program, also known as the "TEBS" program. The December 28, 2007

press release also revealed that Centerline was required to take a $95 million charge on the sale to

reflect the current value of the portfolio. The December 28, 2007 press release further stated:

Centerline Holding Company (NYSE:CHC), the parent company of Centerline Capital
Group, Inc. ("Centerline" or the "Company"), *today announced the completion of a
securitization of the Company's $2.8 billion tax-exempt affordable housing bond
portfolio with Freddie Mac. For accounting purposes, most of the securitization will
be treated as a sale. The transaction represents a major step in Centerline's plan to
transform itself into an alternative asset management company. Centerline also
announced a $131 million equity investment commitment from an affiliate of
Related Companies, its largest shareholder.*

"Over the past several years, the strategic vision embraced by Centerline's Board of
Trustees and management has been to transform Centerline into an alternative asset
management company," said Marc D. Schnitzer, Chief Executive Officer and
President of Centerline. "*With the securitization of our bond portfolio with Freddie
Mac, we have accelerated our progress toward that goal.* The transaction has
materially improved our risk profile by reducing the funding and interest rate risk
inherent in our liability structure. Centerline now has a leaner balance sheet, improved
credit metrics and an increased percentage of revenues derived from asset
management services. *As an alternative asset manager with $11.6 billion of assets
under management, we aim to produce returns and growth comparable to other*

*publicly-traded alternative asset managers."*

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

Stephen M. Ross, Chairman of Related Companies and Centerline, added, *"Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance.* Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."

### Freddie Mac Transaction

*Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac.* The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. For accounting purposes, most of the securitization will be treated as a sale. Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate

swaps, costs to terminate existing financing arrangements and transaction related costs. ***These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD").*** Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization. (Emphasis added.)

53.     Additionally, the December 28, 2007 press release revealed that the Company had

entered into a sweetheart deal with TRCLP, the related company owned by Defendants Ross and

Blau, in which TRCLP agreed to make a $131 million equity investment in Centerline in exchange

for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11%

dividend, as follows:

> **$131 Million Investment from An Affiliate of Related Companies**
> An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. ***The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company.*** The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

54.     Finally, the December 28, 2007 press release revealed that the Company would be

slashing its dividend from $1.68 per share to $.60 per share, as follows:

> Change Dividend Policy: Effective in the first quarter of 2008, ***Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis),*** subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

55.     Immediately following the shocking announcement, that the Company had sold it tax-

exempt bond portfolio to Freddie Mac and abruptly transformed its business model from a tax-exempt

bond fund to an asset manager, Defendants conducted an analyst conference call on December 28,

2007. At the beginning of the call, Defendant Schnitzer revealed that the Company had been planning

this transformation of the Company's business model for nearly a year, stating, "[t]his morning, we announced the ***closing of a transformational transaction that has been in the works_ for close to a year*** and a significant strategic investment in our firm by our larger shareholder." (Emphasis added.)

56.    Defendant Schntizer also revealed that Centerline was required to assume a $140 million contingent obligation on the sale of the debt portfolio to Freddie Mac, stating:

> The Freddie Mac transaction is a fixed-rate securitization of our bond portfolio, slightly over $2.8 billion. That securitization has an all-in cost of approximately 5.39%. The portfolio's current coupon is somewhere between 6.5% and 6.6%. The transaction will give us sale treatment for accounting purposes with respect to the majority of the portfolio and Centerline will retain a $140 million high-yielding B-Piece, top loss piece, and we will remain the primary and special servicer for the portfolio.
>
> \*    \*    \*
>
> TONY HOWARD: When you say first loss, does that mean you take the hit before Freddie Mac takes the hit on the entire portfolio, or just the 140 million part?
>
> MARC SCHNITZER: The $140 million, Tony, is a top loss for the entire portfolio. ***So the first $140 million of losses in the portfolio comes out of that $140 million.***

57.    Analysts and private investors were shocked by Centerline's announcement and during the December 28, 2007 conference call vented their frustration at Defendants' decision to abruptly change the Company's business model by selling its tax-exempt mortgage revenue bond portfolio and slashing its dividend. For instance, Tony Howard of J.J.B Hilliard, W.L. Lyons Inc., stated:

> TONY HOWARD: Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of shareholders have owned your stock over the years for the dividend and for the tax-free status. So in some way, you're basically not only transforming the Company, but you are changing the shareholder base. So you are basically punishing the income (inaudible) the shareholders for a more growth-oriented shareholders that may want to buy your stock in the future.
>
> MARC SCHNITZER: Well, certainly nobody is seeing to punish anybody, and certainly not our shareholders, which all of us are as well. But really, the goal is to step back and look at the Company as its two major constituent parts -- the bond portfolio on one hand and the asset manager on the other hand. The key is to put the

bond portfolio into the hands of the most suitable investor and the investor that will value that income stream from the bond portfolio in the highest possible fashion. We're confident that the Freddie Mac transaction has accomplished that goal. Now the next challenge that we have is to demonstrate to our shareholders that we can create growth within the Company and move forward as an alternative asset manager that has attractive growth opportunities and can capitalize on those opportunities. So that is what we are turning to, that is what we're going to be focused on.

58.    Additionally, investors expressed their anger and disgust with the related party

transaction with TRCLP that Defendants Ross and Blau were using to enrich themselves at the

expense of the Company's outside investors, stating as follows:

> MATT WEST, PRIVATE INVESTOR: This capital raise makes no sense to me. *If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal.* You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?

> *    *    *

> PATRICK COLLINS, PRIVATE INVESTOR: I have to agree with the prior two callers. *I'm actually disgusted by this transaction. How could insiders to reach such a favorable deal for themselves?* If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a preferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in the preferreds. *But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields, and now you're saying, will if that didn't, we're going to change it. You're running this like it's a private company. I would be disgusted if I were you at what you've done -- I'm just disgusted. I would be ashamed at what I did.*

> MARC SCHNITZER: There are really two issues there again. As we said before, the critical issues on the preferred were testing it in the marketplace, which it was; the timing of the investment and the market conditions. And based on the terms that were available from third parties in the marketplace, the need for the timing of the capital and an extremely unstable market, we feel that this is an attractive transaction.

> PATRICK COLLINS: *Well, your shareholders are clearly not agreeing with you.*

Your equities hit a brand-new load today on meaningful volume on even a slow day. So you're wrong. So I really kind of question your thinking on this, and I am just disgusted by it. What shareholder consent is going to be required to get this through?

\*       \*       \*

PARKER PHILLIPS, PRIVATE INVESTOR: I would just like to -- I *would echo the disgust and frustration of previous shareholders who have spoken on this call. I think this is a -- I think this transaction is contemptuous of your existing shareholders*. But in any event, I would like to ask about the timing of this announcement where it's a Friday morning, two days before the end of the year. Why announce this transaction today? Why not wait until the first part of next year, and why not wait at least until a day when people are in the office by and large, particularly your shareholders, who are probably on vacation, most of them? *It just seems strange that you would choose today to announce this transaction*. Could you address that?

\*       \*       \*

MATT WEST: Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. *When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction*. The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale.

59.     Centerline disclosure shocked the market, given the Company's sudden and unexpected announcement of its massive $2.9 billion securitization with Freddie Mac, management's self-dealing transaction and the 64% dividend cut to address liquidity issues created by the securitization transaction. Indeed, these revelations caused the price of Centerline shares to plummet $2.57 or 25% per share, closing at $7.70 per share on December 28, 2007, on unusually heavy trading volume of 4.1 million shares, from the previous day's close of $10.27.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the

publicly traded securities of Centerline between March 12, 2007 and December 28, 2007,

inclusive. Excluded from the Class are defendants, the officers and directors of the Company, at

all relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which defendants have or had a controlling interest.

      61.     At all relevant times, the market for Centerline securities was an efficient market

for the following reasons, among others:

         a.     Centerline securities met the requirements for listing, and were listed, on

the New York Stock Exchange ("NYSE"), an efficient and automated market;

         b.     As a regulated issuer, Centerline filed periodic public reports with the SEC

and the NYSE;

         c.     Centerline regularly communicated with public investors via established

market communication mechanism, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

and

         d.     Centerline was followed by several securities analysts employed by

brokerage firms who wrote reports that were distributed to the sales force and certain customers of

their respective brokerage firms. These reports were publicly available and entered the public

marketplace.

      62.     As a result, the market for Centerline securities promptly digested current

information regarding the Company from all publicly available sources and reflected such

                31

information in Centerline's share price. Under these circumstances, all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

63.    This action is properly maintainable as a class action because:

a.    The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, Centerline's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

b.    Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased Centerline shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.    The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

               i.       whether the federal securities laws were violated by defendants' acts as alleged herein;

               ii.       whether statements disseminated to the investing public and to Centerline's shareholders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

               iii.       whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

               iv.       whether, during the Class Period, the market price of Centerline securities was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

               v.       whether the defendants participated in and pursued the common course of conduct complained of herein; and

               vi.       whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

      64.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make ti impossible for members of the Class to individually redress the wrongs done to them.

      65.      Plaintiff anticipates no unusual difficulties in the management of this action as a

class action.

## NO STATUTORY SAFE HARBOR

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

67.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Washington Mutual who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any  projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### ADDITIONAL SCIENTER ALLEGATIONS

68.    As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in Centerline's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading, or omitted to disclose material facts. Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

69.    As set forth in detail throughout the Complaint, the Defendants, by virtue of their control over, and/or receipt of Centerline's materially misleading statements, and their positions with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein. Defendants knew and/or reckless disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in the Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

70.    In particular, Defendants' scienter is demonstrated by, among other things: (i) their knowledge, at all times during the Class Period, that the Company had been in negotiations to sell

its tax-exempt bond portfolio to Freddie Mac "for close to a year"; (ii) that by cutting the annual dividend from $1.68 per share to $.60 per share, they completely changed the investor profile for Centerline making the Company a significantly riskier investment; (iii) that the Individual Defendants were able to divert $131 million to company insiders by going forward with the TRCLP transaction -- Defendants Ross and Blau would receive approximately 12.2 million new convertible preferred shares at $10.75 per share that will pay an 11% annual dividend with no equity risk; (iv) the Individual Defendants, who were among the Company's most senior officers and trustees, knew or should have known of the portfolio sale to Freddie Mac, and knew or should have known other impact of this transaction on the Company and its shareholders, including the effect that would have on annual dividends; and (v) Defendant Schnitzer, as the Company's CEO, President and Managing Trustee, knew or should have known of the portfolios sale to Freddie Mac at all times during the Class Period.

71.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated price, Company insiders sold 148,578 shares of the Company's stock for gross proceeds of $1,567,740. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per share | Gross proceeds |
|---|---|---|---|---|
| December 21, 2007 | Daryl J. Carter | 36,000 | $11.22 | $403,920 |
| December 20, 2007 | Daryl J. Carter | 83,000 | $10.04 | $833,319 |
| December 19, 2007 | Daryl J. Carter | 20,103 | $10.01 | $201,231 |
| August 20, 2007 | Christopher G. Crouch | 9,475 | $13.61 | $129,000 |
| | TOTAL: | 148,578 | | $1,567,470 |

## LOSS CAUSATION/ECONOMIC LOSS

72.     During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Centerline's stock price and operated as a fraud or deceit on purchasers of Centerline stock by misrepresenting the Company's financial condition and business prospects. Specifically, Defendants made false and misleading statements regarding the Company's mortgage revenue bond portfolio, which generated a large potion of the Company's total revenues and enabled Centerline to pay annual dividends as much as $1.68 per share. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, Centerline stock price reacted negatively as the artificial inflation was removed from Centerline's stock price. As a result of their purchases of Centerline stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

73.     During the Class Period, Defendants' false and misleading statements had the intended effect and caused Centerline stock to trade at artificially inflated levels throughout the Class Period.

74.     As investors and the market became aware that Centerline's prior misstatements and omissions and that Centerline's actual financial condition and business prospects were, in fact, not as represented, Centerline's stock price reacted negatively, damaging investors.

### COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

75.     Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

76.     Throughout the Class Period, defendants, individually and in concert, directly or

indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Centerline securities.

77.    The purpose and effect of defendants' plan, scheme and course of conduct were to artificially inflate the price of Centerline's securities and to artificially maintain the market price of Centerline securities.

78.    The Individual Defendants, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Centerline personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

79.    As a result of the foregoing, the market price of Centerline securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements concerning the operating results and performance of Centerline, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of Centerline securities during the Class Period in purchasing Centerline securities at prices which were artificially inflated as a result of defendants' false and

misleading statements.

80.    Had Plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Centerline securities at the artificially inflated prices that they did.

81.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased Centerline securities in ignorance of the financial risk to them as a result of such nondisclosures.

82.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

83.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Centerline, their control over, and/or receipt and/or modification of Centerline' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein.

84.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

86.    By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Centerline securities during the Class Period.

### COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT

87.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

88.    During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of Centerline and their specific acts, was a controlling person of Centerline

within the meaning of Section 20(a) of the Exchange Act.

89.    Each Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and Centerline concealed from Plaintiff and the other members of the Class during the Class Period.

90.    Each of the Individual Defendants had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing Centerline to disseminate the false and misleading information referred to above.

91.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

92.    By virtue of the conduct alleged above, the Individual Defendants are liable to the Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Centerline's securities during the Class Period.

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date

of the wrongs to the date of the judgment herein;

     E.     Awarding Plaintiff the costs, expenses, and disbursements incurred in this action,

including reasonable attorneys' and experts' fees; and

     F.     Awarding Plaintiff and the other members of the Class such other and further relief

as the Court may deem just and proper in light of all the circumstances of this case.

### JURY DEMAND

     Plaintiff demands a trial by jury.


Dated: New York, New York
       February 15, 2008

By: _____

     **WOLF POPPER LLP**

     Marian P. Rosner (MR 0410)
     Robert C. Finkel (RF 2373)
     James A. Harrod (JH 4400)
     Danielle Disporto
     845 Third Avenue
     New York, NY 10022
     Tel.: 212.759.4600
     Fax : 212.486.2093

     Attorneys for Plaintiff

## PLAINTIFF CERTIFICATION

I, Deborah Dechter, hereby state:

1.      I have reviewed the draft complaint against Centerline Holding Company ("Centerline"), Marc D. Schnitzer, Robert L. Levy, Jeff T. Blau and Stephen M. Ross, and certain of its senior officers and directors, entitled Dechter v. Centerline Holding Company, et. al. and have authorized the filing of the complaint on my behalf by Wolf Popper LLP.

2.      I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period alleged in the Complaint, I made the following transactions in Centerline common stock:

| Transaction | Trade Date | No. of Shares | Price |
|---|---|---|---|
| Buy | 6/20/2007 | 1000 | $19,438.75 |
| Buy | 6/26/2007 | 1000 | $18,809.95 |

5.      During the three-year period preceding the date of my signing this certification, I have not sought to serve, nor have I served, as a representative on behalf of a class in a private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this   15th   day of February 2008.

_____
DEBORAH DECHTER